On Application for Rehearing.
The opinion of September 17, 1999, is withdrawn, and the following is substituted therefor.
D.S.S. ("the mother") and J.B. ("the father") appeal from a judgment terminating their parental rights as to their two daughters, 15-year-old B.B. and 13-year-old A.B. We affirm the judgment as to the mother, but reverse the judgment as to the father.
The mother and father were never married to each other, but they lived together in Clay County, Alabama, for about four years, from 1983 until 1987, a period spanning the births of both daughters. When A.B., the younger daughter, was a year old, the parents separated; the mother remained in Clay County and the father moved to Georgia.
The Clay County Department of Human Resources ("DHR") first investigated reports of child abuse and neglect concerning B.B. and A.B. in 1991. At that time, the two girls were living with their mother, an older brother, and the mother's boyfriend. Most of the abuse and neglect reports stemmed from alcohol abuse and fighting by the mother and her boyfriend. In January 1992, the mother stabbed the boyfriend in the hand with a knife. When DHR caseworker Tammy Harkness arrived at the residence, she found that the children were dirty, had head lice, and had no winter coats.
Between August 1992 and February 1995, DHR received several reports indicating that the mother had left the children unsupervised for extended periods or that she had left them in the care of her boyfriend, who was habitually intoxicated. Ms. Harkness learned that the mother was on probation for a felony theft conviction and that one of the conditions of her probation was that she not allow her boyfriend to be around the children. In February 1995, Ms. Harkness found the boyfriend drunk and hiding under a bed in the mother's residence.
The mother's probation was revoked, and she was incarcerated for a year. During her imprisonment, the mother arranged for C.T., the children's maternal grandmother, to take care of the children. When the mother was released from prison, she went back to the boyfriend and the children remained with C.T. In early 1997, however, C.T. was convicted of perjury and went to prison herself. At that time, DHR was awarded custody of the children, and they were placed in a foster home. The children have not lived with the mother since February 1997.
Tammy Harkness testified that in 1995 DHR entered into a service agreement and rehabilitation plan with the mother. At that time, Harkness told the mother that she needed to stop drinking, to stay out of trouble with the law, and to maintain a stable home. DHR offered the mother counseling and parenting classes and recommended that she attend Alcoholics Anonymous ("AA") meetings and have intensive outpatient therapy.
Harkness testified that, during the 22 months the children had been in foster care, the mother had attended a few AA meetings and counseling sessions, but that she had not stopped abusing alcohol. She said that the mother would appear to be making progress for a few weeks and then she would be arrested for DUI or another alcohol-related offense. A Clay County deputy sheriff testified that in August 1998 *Page 586 
he was called to the home of Mrs. S., the mother of M.S., the mother's current husband, to forcefully remove the mother, who was naked and intoxicated to the point of stupor, from the premises.
At trial in December 1998, the mother testified that she was currently employed as a waitress, that she earned $640 per month, that she was paying $250 per month in child support, and that she visited the children regularly while they were in foster care. The mother invoked her Fifth Amendment privilege not to testify about any alcohol-related offenses. She stated that her court date on one DUI charge was the day after the termination proceeding.
In deciding whether to terminate parental rights, the trial court must apply a two-pronged test. Ex parte Beasley,564 So.2d 950 (Ala. 1990). First, the court must determine whether there is clear and convincing evidence indicating that the child is dependent. Id.; S.F. v. Department of Human Resources,680 So.2d 346 (Ala.Civ.App. 1996). Second, the trial court must determine whether there is a viable alternative to termination. L.A.G. v. State Dep't of Human Resources, 681 So.2d 596
(Ala.Civ.App. 1996).
A trial court may terminate parental rights when it concludes that "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child, or . . . the conduct or condition of the parents is such as to render them unable to properly care for the child and . . . such conduct or condition is unlikely to change in the foreseeable future." §26-18-7(a), Ala. Code 1975.
 The Mother
As grounds for terminating the mother's parental rights, the juvenile court found (1) that the mother was addicted to alcohol and that her addiction was a major factor contributing to her inability to care for the children; (2) that DHR had made reasonable efforts to assist the mother with rehabilitation and reunification with the children, but that those efforts had failed; (3) that the mother had not made substantial progress in rehabilitating herself and was not likely to change in the foreseeable future; (4) that the mother had not made substantial or reasonable efforts to exercise parental duties while the children were in foster care; and (5) that the mother had abandoned the children.
The statutory grounds for terminating parental rights set out in § 26-18-7(a)(1), -(a)(2), -(a)(4), and -(a)(6), Ala. Code 1975, are pertinent to the mother. Those subsections allowed the trial court to consider, among other things, whether the mother had abandoned the children, whether the mother's "excessive use of alcohol . . . render[ed] the [mother] unable to care for needs of the child[ren]," the effect on the children of the mother's "[c]onviction of and imprisonment for a felony," and whether "reasonable efforts by [DHR] leading toward the rehabilitation of the [mother] ha[d] failed." In addition, because the children were no longer in the physical custody of the mother, the trial court was required to consider whether the mother had shown a "[l]ack of effort . . . to adjust [her] circumstances to meet the needs of the child[ren] in accordance with agreements reached . . . with [DHR]." § 26-18-7(b)(4), Ala. Code 1975.
Section 26-18-3(1), Ala. Code 1975, defines "abandonment" as
 "a voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
We have some doubt whether the juvenile court's finding that the mother had abandoned the children is supported by clear and convincing evidence. The evidence established that for the 22 months the children *Page 587 
had been in foster care, the mother had visited them regularly and had paid child support. Nevertheless, we need not specifically address that issue, because we hold that the juvenile court's other findings are supported by clear and convincing evidence. The finding that the mother was addicted to alcohol and that her addiction had contributed to her inability to care for the children is fully supported by the record. See T.M.S. v. Elmore County Dep't of Human Resources, 647 So.2d 746 (Ala.Civ.App. 1994). The court's further finding that the mother had not made sufficient efforts to adjust her circumstances to meet the needs of the children in accordance with the agreements reached with DHR is also supported by the record. See T.L.W. v. State Dep't of Human Resources, 678 So.2d 128
(Ala.Civ.App. 1995). Finally, the court's determination that the mother was unable or unwilling to discharge her responsibilities to and for the children and that the mother's conduct or condition was unlikely to change in the foreseeable future is supported by the evidence. See B.R.M. v. State Dep't of Human Resources,626 So.2d 646 (Ala.Civ.App. 1993).
The mother argues that the juvenile court erred by admitting documentary evidence and testimony containing hearsay. She also argues that the court erred by terminating her parental rights when, she says, DHR had presented no evidence that it had considered any viable alternatives to the termination.
The trial court did not err by overruling the mother's hearsay objection to a documentary report submitted by DHR to the juvenile court. Section 26-18-4, Ala. Code 1975, provides that "proceedings to terminate parental rights shall be governed by Title 12, Chapter 15, Article 3 and by the Alabama Rules of Juvenile Procedure." Title 12, Chapter 15, Article 3, includes §§ 12-15-50 through 12-15-76, Ala. Code 1975. Specifically, § 12-15-65(h) provides:
 "In disposition hearings all relevant and material evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value, even though not competent in a hearing on the petition. The parties or their counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making reports."
The hearsay in the documentary report was admissible by virtue of § 12-15-65(h). See J.V. v. State Dep't of Human Resources,656 So.2d 1234 (Ala.Civ.App. 1995).
We find no reversible error in the overruling of the mother's hearsay objection to the testimony of DHR social worker Tammy Harkness. Ms. Harkness testified that B.B. reported to her that she had been sexually molested by her mother's boyfriend when she was five years old. Section 12-15-65(i), Ala. Code 1975, provides:
 "A statement made by a child under the age of 12 describing any act of sexual conduct performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in all dependency cases brought by the State of Alabama acting by and through a local department of human resources if:
 "(1) The statement was made to a social worker, child sex abuse therapist or counselor, licensed psychologist, physician, or school or kindergarten teacher or instructor; and
 "(2) The court finds that the time, content, and circumstances of the statement provide sufficient indicia of reliability. In making its determination the court may consider the physical and mental age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, and any other factor deemed appropriate." *Page 588 
Ms. Harkness's testimony satisfied subsection (1) of § 12-15-65(i) because the child reported the alleged molestation to a DHR social worker. The trial court made no specific finding concerning whether the circumstances surrounding the making of the statement provided sufficient indicia of reliability to make the statement admissible under subsection (2) of § 12-15-65(i). Nevertheless, we hold that any error in the admission of the statement would have been harmless, for the following reasons: (1) the alleged abuse was mentioned briefly and never again referred to; (2) the mother's boyfriend, the alleged perpetrator of the abuse, had died by the time of trial and was, therefore, not a factor in deciding whether the mother's parental rights should be terminated; and (3) the trial court's judgment focused on the mother's alcohol addiction and related legal problems and did not mention the alleged abuse. See Rule 45, Ala.R.App.P.; Bowlen v. State Dep't of Pensions Security, 51 Ala. App. 665, 288 So.2d 728
(Ala.Civ.App. 1974).
The evidence at trial established that there were no viable alternatives to termination of the mother's parental rights. When the mother was incarcerated, she designated C.T., the children's maternal grandmother, as the children's custodian. C.T., however, lost the children when she herself was imprisoned following conviction of a felony. At trial, C.T. testified that she could not care for the children because her health was "real bad." The mother suggested no other relative resource who would be willing or able to care for the children. The evidence, therefore, clearly and convincingly indicated that there were no viable alternatives to termination of the mother's parental rights. See L.W. v. State Dep't of Human Resources,591 So.2d 872 (Ala.Civ.App. 1991).
That portion of the juvenile court's judgment terminating the parental rights of the mother is affirmed.
 The Father
DHR's first contact with the father was to notify him, in February 1997, of the shelter-care hearing following the children's being removed from the custody of their grandmother, C.T. Tammy Harkness, the DHR caseworker, testified that DHR had never attempted to contact the father during the years 1991-1994, when it was receiving reports of child abuse and neglect concerning the children. Harkness said that she had tried to reach the father in 1995, when the mother's probation was revoked, but that she was unable to locate him. Once Harkness learned that the mother had arranged for the maternal grandmother to have custody of the children while she, the mother, was incarcerated, Harkness did not pursue any further efforts to locate the father.
The father testified that he was not involved with his children during the early years of their lives, but that beginning in 1992, and continuing for two or three years, B.B. and A.B. had spent the summers with him. The father said that, after DHR notified him in February 1997 that the girls "had problems," he attended every court hearing and visited his daughters while they were in foster care. He said that he had not been ordered to pay, and had not actually paid, any child support for the girls. He testified that he told Ms. Harkness he was in the process of moving, but that he would telephone a social worker he knew at a Georgia agency to arrange for a home study when he found a place to live. He testified that he loved his daughters, that he thought he had a good relationship with them, and that he was willing to assume custody of them.
Harkness testified that the last time she had talked to the father before the trial of the termination proceeding (which was held on December 7, 1998) was almost one year earlier, on December 11, 1997. At that time, the father told Harkness that he would contact her and the Georgia social-service agency when he was ready to have a home study done. Harkness said she *Page 589 
never heard from the father again. The father was present in court on October 15, 1998, for another hearing relating to this case and was, at that time, served with notice of the petition to terminate parental rights. In response to questions from the father's attorney, Harkness testified:
 "Q. All right. And what efforts did you make subsequent to that time to contact [the father]?
"A. None.
 "Q. What efforts did you make or the department make to find out if he, in fact, had a home?
"A. None.
 "Q. What efforts did you make to find out if he was gainfully employed?
"A. None."
Harkness acknowledged that DHR did not have a service agreement with the father, did not suggest any rehabilitation programs to the father, and did not warn the father that, unless he made substantial efforts to satisfy DHR that he was a fit parent for the children, DHR would move to terminate his parental rights.
As grounds for terminating the father's parental rights, the juvenile court found (1) that DHR had made reasonable efforts to assist the father with rehabilitation and reunification with the children, but that those efforts had failed; (2) that the father had not made substantial progress in rehabilitating himself and was not likely to change in the foreseeable future; (3) that the father had not made substantial or reasonable efforts to exercise parental duties while the children were in foster care; (4) that the father had not made a substantial effort to establish a custodial relationship with, or a home environment for, the children; and (5) that the father had abandoned the children.
The statutory grounds for terminating parental rights set out in § 26-18-7(a)(1) and (a)(6), as well as § 26-18-7(b)(1) through (4), Ala. Code 1975, are pertinent to the father. Subsection (a)(1) sets out abandonment as a basis for terminating parental rights. Subsection (a)(6) permits the trial court to consider, among other things, whether "reasonable efforts by [DHR] leading toward the rehabilitation of the [father] ha[d] failed." In addition, because the children were no longer in the physical custody of the father, the trial court was required to consider the following factors set out in subsections (b)(1) to (4):
 "(1) Failure by the [father] to provide for the material needs of the child or to pay a reasonable portion of its support, where the [father] is able to do so.
 "(2) Failure by the [father] to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the [father].
 "(3) Failure by the [father] to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the [father] to adjust his circumstances to meet the needs of the child in accordance with the agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
Many, if not most, of the trial court's findings with respect to the father are not supported by any evidence, much less clear and convincing evidence. Section 26-18-7(a)(6) requires DHR to make an effort to rehabilitate a parent before it seeks to terminate his or her parental rights. See Ezekiel v. State Dep't of Human Resources, 562 So.2d 524, 525 (Ala.Civ.App. 1990). The trial court's finding that DHR had made reasonable efforts to assist the father with rehabilitation is patently wrong. Tammy Harkness conceded as much. Likewise, the finding that the father had made little progress toward rehabilitation and that he was unlikely to change in the foreseeable future is unsupported by the evidence. *Page 590 
DHR argues that it had neither the authority nor the duty to provide the father, who was a resident of Georgia, with rehabilitative services. It maintains that the State of Georgia was potentially responsible for offering such services to the father. Moreover, it claims that Georgia's responsibility to assist the father was not triggered because the father never contacted the Georgia authorities about having a home study done. In essence, DHR insists that it should not be faulted for failing to assist the father, when any assistance was dependent upon the father's making the first move and the father did not, in fact, take the initiative in Georgia. Finally, DHR argues that the Interstate Compact on the Placement of Children (§ 44-2-20 et seq., Ala. Code 1975), prevented it from transferring A.B. and B.B. to Georgia without approval from the Georgia authorities.
Although we accept DHR's argument that the State of Georgia has the authority and duty to provide social services for its own residents, and that the Interstate Compact prevented DHR from transferring the girls to their father without the approval of the Georgia authorities, we reject the implication in DHR's argument that DHR is absolved of any responsibility in this case simply because the father lives in Georgia and did not follow up on a home study with the Georgia social-service agency. If DHR, in an Alabama court, seeks to terminate the parental rights of a father residing in Georgia, as to children residing in Alabama, on the ground that "reasonable efforts by [DHR] leading toward the rehabilitation of the [father] ha[d] failed," it must do more than suggest one time to the father that he contact the appropriate Georgia agency about having a home study done. Compare M.C. v. K.M., [Ms. 2981062, December 10, 1999] ___ So.2d ___ (Ala.Civ.App. 1999) (finding no error in the termination of parental rights of an out-of-state father who had failed to comply with repeated attempts by Alabama social workers to provide assistance through a sister state).
Based on the evidence presented at trial, we do not see how the trial court could make any determination about whether the father was even in need of rehabilitation, much less a determination that the father had failed to take advantage of rehabilitative services. In light of DHR's admitted failure to investigate the father's circumstances, we must conclude that there simply was not enough evidence to give the trial court a clear picture of the father's situation.
In V.M. v. State Dep't of Human Resources, 710 So.2d 915
(Ala.Civ.App. 1998), this court reversed a judgment terminating a mother's parental rights because, it held, the trial court's conclusion that there was no viable alternative to the termination was plainly and palpably wrong. In V.M., DHR had rejected a grandmother as a relative resource because it had negative, four-year-old information about the grandmother and because "the grandmother had shown a lack of initiative in contacting DHR regarding the necessary paperwork." 710 So.2d at 921. This court stated:
 "All of DHR's objections to the grandmother as a relative resource were based on past history . . . and there was no evidence that she had been considered in light of her present circumstances [and] her present willingness to be a resource for the children . . . . DHR must present `evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least drastic alternative.' In light of the evidence that the grandmother's present circumstances had not been investigated, the trial court's decision to terminate the mother's parental rights based upon the lack of viable alternatives was plainly and palpably wrong."
V.M., 710 So.2d at 921 (emphasis added) (citation omitted). The statements we made in V.M. apply with even greater force in this case. DHR made virtually no *Page 591 
effort to investigate the father's current living conditions, had virtually no information about the father's current employment circumstances, and made the determination that the father was unreliable because he had neglected to telephone DHR about a home study. As we implied in V.M., and as we now explicitly hold, DHR — not the prospective custodian — has the burden of initiating investigations, and it is DHR's burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child. Because DHR did not comply with its statutory duties regarding the father, its petition to terminate the father's parental rights was premature. We must, therefore, reverse that portion of the juvenile court's judgment terminating the parental rights of the father.
OPINION OF SEPTEMBER 17, 1999, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; RULE 39(k) MOTION DENIED; 2980615 — AFFIRMED; 2980616 — REVERSED AND REMANDED.
Yates and Thompson, JJ., concur.
Robertson, P.J., and Monroe, J., concur in the result.